OF

# NORTH CAROLINA

AT

# RALEIGH

## FALL SESSION 1969

STATE OF NORTH CAROLINA EX REL UTILITIES COMMISSION, AND
VIRGINIA ELECTRIC AND POWER COMPANY v. WOODSTOCK ELEC-
TRIC MEMBERSHIP CORPORATION AND NORTH CAROLINA ELEC-
TRIC MEMBERSHIP CORPORATION

### No. 6910UC339

(Filed 27 August 1969)

1. **Electricity § 2; Utilities Commission § 7 — electric service areas —
   assignment of same area to two suppliers**

   In this proceeding for the assignment of electric service areas pursuant
   to G.S. 62-110.2(c)(1), order of the Utilities Commission assigning areas
   to an electric membership corporation for loads up to 400 KW demand and
   jointly to the electric membership corporation and an electric power com-
   pany for loads with contract demand greater than 400 KW, subject to con-
   sumers' reasonable choice of supplier, does not in effect leave the areas
   unassigned for loads exceeding 400 KW, since under the Commission's order
   other electric suppliers may not extend their lines into the areas to serve
   demands of more than 400 KW.

2. **Electricity § 2; Utilities Commission § 7— assignment of same elec-
   tric area to two suppliers—statutory authority**

   The Utilities Commission did not exceed its authority under G.S. 62-110.2
   in assigning the same areas jointly to two electric suppliers, subject to con-
   sumers' reasonable choice of supplier, since under appropriate circumstances
   and appropriate findings by the Commission, public convenience and necessity
   may require such an assignment.

3. **Electricity § 2; Utilities Commission § 7— assignment of same elec-
   tric service areas to two suppliers—arbitrariness**

   The Utilities Commission did not arbitrarily exercise its discretion in
   assigning the same areas jointly to two electric suppliers, the Commission

having exercised its discretionary authority in good faith in the light of existing facts and circumstances.

**4. Electricity § 2; Utilities Commission § 7— assignment of electric service areas to two suppliers—maximum individual assignment— necessity for findings of fact.**

In this proceeding for the assignment of electric service areas wherein the Utilities Commission assigned certain areas to an electric membership corporation for loads up to 400 KW demand and jointly to the electric membership corporation and an electric power company for loads with contract demand greater than 400 KW, portion of the Commission's order establishing a 400 KW load as the maximum of the individual assignment to the electric membership corporation is arbitrary and must be reversed where the Commission made no findings of fact to justify such 400 KW maximum.

**5. Electricity § 2; Utilities Commission § 7— assignment of same electric service areas to two suppliers—constitutionality**

Order of the Utilities Commission assigning electric service areas to an electric membership corporation for loads up to 400 KW demand and jointly to the electric membership corporation and an electric power company for loads with contract demand greater than 400 KW, subject to consumers' reasonable choice, *is held* not to violate the constitutional rights of the electric membership corporation or the consuming public, neither having shown any constitutional right to have the areas assigned to any electric supplier.

APPEAL by Woodstock Electric Membership Corporation and North Carolina Electric Membership Corporation from an order of the North Carolina Utilities Commission entered 18 December 1968.

Commissioner Eller drafted the order which was concurred in by Chairman Westcott and Commissioners McDevitt and Williams. Commissioner Biggs dissented as to portions of the order which are not pertinent to this appeal.

Pursuant to Commission Rules, Woodstock Electric Membership Corporation (hereinafter referred to as Woodstock) on 5 September 1967, made application for assignment to it under G.S. 62-110.2(c)(1) of areas of Beaufort, Hyde, and Washington Counties. Virginia Electric and Power Company (hereinafter referred to as VEPCO) likewise, on 9 October 1967, made application for assignment to it under G.S. 62-110.2(c)(1) of areas of Beaufort, Hyde, and Washington Counties. The applications of the parties overlapped in several particulars, and the applications were consolidated for purposes of hearing before the Commission and its assignment order.

G.S. 62-110.2(c)(1), which was enacted in 1965, provides as follows:

"In order to avoid unnecessary duplication of electric facilities, the Commission is authorized and directed to assign, as soon as practicable after January 1, 1966, to electric suppliers all areas,

by adequately defined boundaries, that are outside the corporate limits of municipalities and that are more than 300 feet from the lines of all electric suppliers as such lines exist on the dates of the assignments; provided, that the Commission may leave unassigned any area in which the Commission, in its discretion, determines that the existing lines of two or more electric suppliers are in such close proximity that no substantial avoidance of duplication of facilities would be accomplished by assignment of such area. The Commission shall make assignments of areas in accordance with public convenience and necessity, considering, among other things, the location of existing lines and facilities of electric suppliers and the adequacy and dependability of the service of electric suppliers, but not considering rate differentials among electric suppliers.

Electric power companies and electric membership corporations are defined by statute as "electric suppliers;" municipally-owned systems are not so defined. G.S. 62-110.2(a)(3).

From the total area covered by the two applications there arose four categories of area: (1) Area claimed by Woodstock which is not contested by VEPCO; (2) area claimed by VEPCO which is not contested by Woodstock; (3) area claimed by both Woodstock and VEPCO; and (4) area claimed by Woodstock which VEPCO seeks to leave unassigned, or, in the alternative, assigned to VEPCO. This appeal is not concerned with categories (1) and (2); and although parts of category (3) were assigned by the Commision to one or the other of the claimants without exception being taken, this appeal is concerned with a portion of category (3) and all of category (4).

The areas in controversy on this appeal have not been described by metes and bounds, but, subsequent to the original filing of applications, maps were prepared upon which the areas are drawn and colored. For convenience of discussion the map filed in this cause as VEPCO Exhibit No. 2 is used for reference by the Commission, by both parties in their briefs, and by this Court. Category (3) areas are colored yellow, and category (4) areas are colored blue. The areas in controversy on this appeal are labeled and colored on the map (VEPCO Exhibit No. 2) as follows: B-1 in blue, B-2 in yellow, B-3 in blue, B-4 in yellow, B-5 in yellow, and B-6 in blue.

Areas B-1, B-2, B-3, and B-5 lie in a corridor running generally north-east from the City of Washington to the Town of Pantego. Area B-4 lies north-east of the City of Washington, east of Pinetown, and extends generally north toward the Town of Plymouth. Area B-6 is a large area bordering on the north bank of the Pamlico River, and lying generally south of the Town of Belhaven. This area (B-6) has

Bath Creek (near the Town of Bath) as its western boundary, and the Pungo River as its eastern boundary.

The Utilities Commission found as a fact that "[t]he areas designated B-1, B-2, B-3, B-4 and B-5 (by VEPCO's Exhibit No. 2) are areas of potential industrial development . . . ," and further found as a fact that "[t]he area designated B-6 (by VEPCO's Exhibit No. 2) as previously described is an area of great industrial potential . . ." These areas were thereafter assigned by the Commission in the following manner:

> "To Woodstock for purposes of loads up to and including 400 KW demand; all loads with contract demands greater than 400 KW being hereby assigned jointly to VEPCO and Woodstock; provided that this joint assignment is made subject to the consumers' reasonable choice of supplier, with prior notice to the Commission as herein provided, all those areas designated B-1, B-2, B-3, B-4, B-5 and B-6."

From this assignment Woodstock and the intervenor, North Carolina Electric Membership Corporation, appealed.

*Crisp, Twiggs & Wells, by William T. Crisp, for Woodstock Electric Membership Corporation and North Carolina Electric Membership Corporation, appellants.*

*Joyner, Moore & Howison, by R. C. Howison, Jr., for Virginia Electric and Power Company, appellee.*

*Edward B. Hipp and Larry G. Ford for North Carolina Utilities Commission.*

BROCK, J.

Appellants have abandoned all exceptions and assignments of error to the findings of fact by the Utilities Commission. The record on appeal contains the following *ex parte* statement by appellants: "Inasmuch as appellants have not based their exceptions, or any of them, upon the ground that the evidence was insufficient to support the Commission order appealed from the record of the evidence has not been narrated, nor will the transcript thereof be filed with the Court of Appeals . . . ."

Although appellants' assignments of error Nos. 1, 2, 3, 4 and 5 are addressed to certain of the findings of fact by the Commission, and although these same assignments of error are listed as supporting their argument in the brief, we are foreclosed from considering them because of the absence of the full transcript. Also appellants open

UTILITIES COMM. v. ELECTRIC MEMBERSHIP CORP.

their argument in the brief with the following concise statement of their position:

"IN ASSIGNING AREAS B-1 THROUGH B-6 TO WOOD-STOCK ONLY FOR LOADS UP TO 400 KW DEMAND, AND BY 'ASSIGNING' THE SAME AREAS TO BOTH APPLI-CANTS FOR HIGHER LOADS SUBJECT TO CONSUMER CHOICE, THE COMMISSION (A) EXCEEDED ITS STATU-TORY AUTHORITY, (B) ACTED ARBITRARILY AND CA-PRICIOUSLY, AND (C) VIOLATED THE CONSTITU-TIONAL RIGHTS OF BOTH WOODSTOCK AND THE CON-SUMING PUBLIC.

"(Appellants' Assignments of Error 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 15, 16, 17, 20, and 21, Rpp. 94-103).

"(It was because of appellants' firm belief in the correctness of the foregoing point that they saw no necessity in relying upon any insufficiency of the evidence and therefore proposed that no testimony should be narrated or cited to the Court in this appeal. See appellants' Statement Pertaining to the Record on Appeal, Rpp. 106-107.)"

In view of the foregoing, the facts of this case are now established by the findings of facts of the Utilities Commission. Therefore, since the outcome of this appeal rests largely upon the findings of facts, we quote here in full the findings of facts made by the Utilities Commission.

"1. Both VEPCO and Woodstock are electric suppliers as defined by Section 62-110.2(a)(3) of the North Carolina General Statutes; both are properly before the Commission, which has jurisdiction over the subject matter of the proceeding. None of the municipalities having lines in the area are electric suppliers as defined by the statute; nor were any of them parties to the proceeding.

"2. VEPCO is an electric public utility furnishing wholesale and retail electric service for profit to the general public in, among other areas, Beaufort County, Hyde County, and Washington County. VEPCO generates the preponderance of the electric power it sells.

"3. Woodstock is a nonprofit electric membership corporation furnishing electric service to its members in the various areas in the same three counties named in Finding No. 2. Woodstock does not generate electric power, but purchases the preponderance of its total requirements as a wholesale customer of VEPCO.

"4. Both VEPCO and Woodstock are capable of supplying, and do supply, good, adequate, and dependable electric service for the requirements of their existing customers and members, respectively, in the areas of the three counties mentioned.

"5. The North Carolina Utilities Commission has extensive jurisdiction over the rates, services, and level of earnings of VEPCO; it has limited jurisdiction over Woodstock relating primarily to the assignment of territory, preventing or relieving promotional rebates, preferences, and unjust discriminations in service and rates, compelling efficient, adequate, and dependable service, and the licensing of generating plants.

"6. The total area involved in the applications is generally outlined on the south by the Pamlico River, on the southwestern corner by the City of Washington, on the northwestern side by the City of Plymouth and the Roanoke River, on the north by Albemarle Sound, on the northeast by Tyrrell County, Pettigrew State Park (Lake Phelps) and Alligator Lake, and on the southeast by Swan Quarter. Included within this general outline are the Towns of Pantego, Pinetown, Belhaven, Bath, Roper, Creswell, and Cherry, together with numerous unincorporated communities, points, and places. The Dismal Swamp lies in the central portion of the total area. The Intracoastal Waterway winds northerly from the Pamlico River to the Pungo River and thence generally northeast out of the area. The Pungo River runs generally southeast from Plymouth practically through the center of the total area to confluence with the Pamlico. Bath Creek, Pungo Creek, and Little Creek are in the southern portion of the total area. Scuppernong River, Deep Creek, and Bull Creek are in the north of the general area. The Norfolk & Southern Railway runs through the area northeast from the City of Washington to Pinetown from which it branches northeast to Pantego and Belhaven and northerly to Plymouth and points north.

"7. The entire area of the applications, being situate outside the corporate limits of municipalities, and more than 300 feet from the lines of another supplier as defined by the Act, must be described as rural and agricultural. Some portions of the general area, as will be discussed more particularly later, are areas of industrial potential, but they cannot be presently described as industrialized. Topographically, the area is low and flat with a number of swamps. Drainage and development of much of the low, swampy areas for agricultural purposes is underway.

"8. The historical development of electrical facilities in the

area as a whole may be described as follows: For many years, VEPCO has served Woodstock as well as the municipal systems of the Cities of Washington and Belhaven at wholesale. VEPCO serves the Towns of Roper, Creswell, Cherry, and Plymouth at retail. VEPCO's distribution facilities in the general area radiate almost exclusively southwest and northeast from the City of Plymouth and in all directions from Roper, Creswell, and Cherry. VEPCO's distribution facilities are concentrated almost exclusively in the northern third of the total area. For the purpose of moving bulk power, VEPCO has a 34.5 KV line in the southern portion of the total area extending generally northeasterly and paralleling the railroad from the City of Washington to the Towns of Pantego and Belhaven. VEPCO has one (1) retail distribution customer on this line at approximately 400 KW demand.

"Woodstock has its headquarters at Pantego in the south-central portion of the total area, at which point the cooperative also takes its power from VEPCO at wholesale. Woodstock's distribution facilities extend in all directions from Pantego and, in general, may be said to cover the southern two-thirds of the area, reaching south to the Pamlico, southwest to the City of Washington, northwest to the City of Plymouth, north to and beyond the western edge of Pettigrew State Park (Lake Phelps), northeast to a point near the southwestern edge of Alligator Lake, and east to Swan Quarter, covering generally all intermediate areas. Woodstock serves Pantego and a small part of Pinetown at retail.

"The distribution facilities of the City of Washington and Woodstock overlap and intertwine to a substantial degree in the area outlying the City of Washington and extending east along the Pamlico as far as Bath and Bayview, and northwest to and through Pinetown.

"9. There are virtually no facilities of any supplier as defined in the Act other than VEPCO in the portions of the total area shown in red on the maps of the parties and which VEPCO seeks to have assigned to it without opposition in these proceedings. In one area shown in red and sought without opposition by VEPCO, to wit, the Great Swamp Area northeast of the City of Washington in Beaufort County, there are no lines of consequence by a supplier as defined by the Act, although there appear to be a number of lines of the City of Washington in the southwestern portion of said red area.

"10. There are virtually no facilities of any supplier as defined in the Act other than Woodstock in the portions of the total

area shown in green on the maps of the parties and which Woodstock seeks to have assigned to it without opposition in these proceedings, although as stated, there appear to be a number of lines of the City of Washington in said green areas.

"11. In one large area in Beaufort County shown in blue on the maps of the parties (marked B-6 on VEPCO Exhibit No. 2 and hereafter referred to as the 'B-6' area) there are no lines of any supplier as defined in the Act other than Woodstock, although there are lines of the City of Washington as herein discussed.

"This area is bounded by the Pamlico River on the south, Bath Creek on the west, Pungo Creek on the north and the Pungo River as it leads into the Pamlico River on the east.

"Woodstock seeks to have this area assigned to it; VEPCO seeks to have the area left unassigned or, in the alternative, assigned to VEPCO.

"12. In the areas colored blue on the maps of the parties and marked B-1 and B-3 on VEPCO Exhibit No. 2 (and hereafter referred to by reference to the VEPCO Exhibit) there are virtually no facilities of any supplier as defined in the Act other than Woodstock, except for VEPCO's 34.5 KV line through Area B-3 and the VEPCO retail customer in Area B-1, as previously found. The evidence reveals that the City of Washington has lines in the area, but the evidence does not permit their specific identification, location, or description.

"13. The areas numbered H-1, W-1, W-2, W-3, W-4, W-5, W-6, W-7, W-8, W-9, W-10, W-11, and B-4 (by VEPCO Exhibit No. 2), and colored in yellow on the maps of both parties have either no lines or very limited 'Dead-end' lines of any supplier as defined by the Act. These areas are in large measure undeveloped, unpopulated areas sought by both Woodstock and VEPCO. The location of the areas in proximity to other areas served by the respective suppliers predominates over the actual location of the suppliers lines in the territories. In some of these areas, particularly B-4 and B-5, there are lines of municipal systems, but the evidence does not permit their specific identification, location, or description.

"14. The area marked B-2 (by VEPCO Exhibit No. 2) and colored yellow on the maps of the parties has the aforesaid 34.5 KV line running east-west through the south-central portion. The area marked B-5 (by VEPCO Exhibit No. 2) and colored yellow has the aforesaid 34.5 KV line running along the northern

border thereof. There are no other lines of a supplier as defined by the Act in either area. Woodstock and VEPCO each seek to have the areas assigned to themselves. The evidence indicates the City of Washington has substantial distribution facilities within the areas, but the evidence does not permit identification, description, and evaluation of these facilities.

"15. The areas designated B-1, B-2, B-3, B-4, and B-5 (by VEPCO's Exhibit No. 2) are areas of potential industrial development in that they are characterized by proximity to the railroad, major highways, have available sources of large power supply, are topographically suited for industry, have good communications facilities, and are near the population centers of the total area.

"16. The area designated B-6 (by VEPCO Exhibit No. 2) as previously described is an area of great industrial potential in that it has been established that the area contains one of the richest phosphate deposits in the United States, is under active consideration for phosphate mining operations in the order of those now at the so-called Texas Gulf Sulphur site immediately south of and directly across the Pamlico River. Much of the area is already under lease or option for large phosphate mining operations. These mining operations and processes usually require complex and technical electric power accommodations, very large blocks of available power, alternate sources of power supply, and experienced supplier personnel readily available and technically trained. Further, such mining operations tend to attract allied industrials, such as chemicals and fertilizer, having large power requirements, and requiring large capital investments to install service.

"17. Industrial and manufacturing concerns tend to locate on and demand the services of VEPCO as opposed to Woodstock. There are many reasons for this. Some industries are philosophically opposed to, and wary of, becoming members in cooperatives where they have no more protection than a single vote in rate and policy matters; i.e., they prefer the regulation of the State Commission to the regulation of the Cooperatives' membership and the REA. Others base their preference on the electric utility's financial strength and its ability to supply operational expertise, specialized equipment, alternate and emergency supplies of energy and many others.

"Industries usually have more than one available site for location and, all other things being equal, tend to choose that site

served or to be served by VEPCO and tend not to choose the site to be served by Woodstock. While the phosphate deposit in the B-6 area will require the mining industry to locate there without regard to which supplier is assigned the area, the testimony of mining officials is to the effect that assignment to Woodstock would tend to cause their companies not to perform all their mining processes on site and that they probably would only mine the basic product and ship it elsewhere for operations and processes requiring heavy electric loads. The testimony further indicates that manufacturers and producers other than mining will tend not to locate near the mines if the area is assigned exclusively to Woodstock.

"18.   Of the total territory sought (1196 square miles) throughout the three (3) counties involved, approximately 22.6% (270 square miles) is claimed by VEPCO without substantial controversy; 56.7% (677 square miles) is claimed by Woodstock without substantial controversy; and 20.7% (249 square miles shown in 15 separately designated yellow and three (3) separately designated blue areas) is claimed in one way or another by both parties.

"19.   The areas where Woodstock's facilities are located are predominantly residential and farming, or rural, areas. In 1967 Woodstock sold 17,515,490 kilowat hours (KWH) of electricity. It serves 3,531 members, of which 3,206 are residential customers. Woodstock serves two (2) industrial customers with demands greater than 50 KW. Its largest service demand is to Coastal Lumber Company, with a demand exceeding 240 KW and possibly as high as 400 KW demand.

"20.   The portions of the total area in which VEPCO's facilities are located are also predominantly residential and farming, or rural, areas. However, VEPCO has a number of very large power users in this and other states. It has a permanent staff of experts in promoting industrial development and attending to complex power supply and load requirements.

"21.   Woodstock has 601 miles of distribution lines in the three-county area. VEPCO has approximately one-third (⅓) as many miles distribution facilities in the total area as Woodstock in addition to 60 miles of 34.5 KV line and 20 miles of 115 KV line.

"22.   At December 31 1967, VEPCO had $380,337,681 in equity capital and retained earnings; Woodstock had 'patronage capital' amounting to $549,411.

"23. VEPCO is financed by capital furnished from the sale of securities in the financial markets and from internally generated funds. Its bonds are rated AA, and it has a proven ability to raise large sums of capital on comparatively short notice. Woodstock is dependent upon appropriations of the United States Congress and the approval of the Rural Electrification Administration administrator and upon internally generated funds for its capital. While Woodstock has never been called upon to provide service for which it could not obtain capital, it nevertheless has not been called upon to raise capital to meet the electric needs of extremely large industrial customers.

"24. Woodstock is organized and exists for the purpose of furnishing electricity to persons in rural areas not otherwise having central station service. It is not organized to, and does not operate on, the basis of 'pecuniary profit,' as does VEPCO. For this reason, the procurement of large volume industrial loads is not as fully compatible with the corporate and public objectives of Woodstock as it is with VEPCO."

[1]  With respect to appellants' assertion that the Utilities Commission exceeded its statutory authority, appellants contend that the area is effectively left unassigned as to loads exceeding 400 KW, and that the Commission has no authority to designate an area as unassigned except under those conditions set out in the statute. However, we hold that the Commission's order does not purport to leave or designate the areas as unassigned. If unassigned, conceivably, any electric supplier might extend its lines into the areas to serve demands of more than 400 KW; but such is not possible under the Commission's order. The order specifically assigns the areas to Woodstock for loads up to and including 400 KW, and to Woodstock and VEPCO for loads in excess of 400 KW. This clearly constitutes an assignment of the areas to Woodstock and VEPCO for service of loads in excess of 400 KW.

[2]  Appellants additionally contend that the statute does not contemplate or allow a joint assignment of the same territory to two or more electric suppliers. Thus they contend the Commission was without authority to assign the areas jointly to Woodstock and VEPCO for loads in excess of 400 KW.

Counsel for appellants engage in an ingenious exercise in semantics in arriving at the conclusion that ". . . the applicable statutes clearly forbid this . . ." joint assignment. However, we do not determine that such a statutory prohibition exists. The statutes are silent on the subject, the legislature being content to admonish the

Commission to ". . . make assignments of areas in accordance with public convenience and necessity, considering, among other things, the location of existing lines and facilities of electric suppliers and the adequacy and dependability of the service of electric suppliers. . . ." G.S. 62-110.2(c)(1), *supra*. While it may be that public convenience and necessity may determine that the majority of assignments under the statutes should properly be to a single electric supplier; nevertheless, under appropriate circumstances and appropriate findings by the Commission, public convenience and necessity may determine that some areas be assigned to two or more electric suppliers with later determination of the circumstances under which a particular electric supplier may properly extend service to a particular consumer. This is not to say that the Commission can arbitrarily attach conditions to a franchise, for it must exercise its discretion in good faith in the light of existing facts and circumstances. "But the vesting of discretionary power in an administrative agency connotes the authority to choose between alternate courses of action, and the courts are without authority to act as supervisory agencies to control and direct the exercise of such discretion when it is exercised in good faith and in accordance with law." 1 Strong, N.C. Index 2d, Administrative Law, § 3, p. 39.

We have not ignored the cases cited by appellants *(Western Colorado Power Co. v. Public Utilities Com'n,* 428 P. 2d 922; *Public Utilities Com'n v. Home Light and Power Co.,* 428 P. 2d 928) and the case cited by appellee *(Public Util. Com. v. Grand Val. Rural Power Lines, Inc.,* 447 P. 2d 27) which each of them argue is determinative of the question. However, after carefully studying those cases we find that the factual differences between the cases, and the statutory, constitutional and case law differences between Colorado and North Carolina render the opinions of little value to us.

[3]    We consider now whether the Commission has arbitrarily exercised its discretion in assigning jointly to Woodstock and VEPCO the areas B-1 through B-6 for service of consumer demands in excess of 400 KW. In addition to the findings of fact by the Commission, which have been quoted in full above, the Commission made numerous general statements and conclusions relative to its resolution of this controversy. Although lengthy, we feel it appropriate to quote these statements and conclusions rather than undertake to paraphrase or summarize them.

"We believe the underlying guides to territorial assignments between electric suppliers are:

"(1) The reasonable present and probable future electric

power needs and preferences of the public in the affected areas as a whole.

"(2) The establishment of territorial integrity for the respective suppliers reasonably consistent with their financial and operational abilities and objectives.

"(3) The avoidance of future unnecessary duplication of electric facilities to the maximum reasonable extent.

"Specifically, in making the territorial assignments hereinafter, we have considered and weighed the following factors, among others:

"(1) THE PHYSICAL CHARACTERISTICS OF THE AREAS INVOLVED. This includes:

"(a) The size of the area to be assigned. We consider it generally inadvisable to assign very small, isolated areas to a supplier since small, 'island' territories would be difficult to administer;

"(b) The topography of the area. Such natural and man-made features as rivers, mountains, railroads, and highways are frequently natural boundaries of communities of interest and should be considered;

"(c) The location and population density of an area. A built-up area immediately adjacent to a municipality in which one supplier already serves is related to the municipality and the supplier serving within the municipality;

"(d) Whether an area is essentially residential, agricultural, commercial, light industrial, or heavy industrial. These characteristics have a bearing on the needs of the area as well as on the ability of a supplier to serve those needs.

"(2) THE EXISTENCE OF ELECTRIC LINES IN THE AREA. This includes:

"(a) Whether the lines are for transmission or distribution. For example, we consider that the mere existence of a transmission line through a residential or agricultural area of itself has little bearing on whether the area should be assigned to the owner of the transmission line, for it generally is neither practicable from an engineering standpoint nor feasible economically to perform the step-down transformation which would be necessary to serve a residential, small commercial, or agricultural load directly from the line. On the other hand, the existence of a transmission line through an area with

industrial potential may have a direct bearing on assignment of that area because transformation directly from the line to meet a large demand would be both practicable and feasible.

"(b) If the lines are distribution lines, their voltage level and type of conductors must be considered. For example, a single phase distribution line is not necessarily duplicated by the construction of a three-phase line to serve a load which the single phase line will not accommodate.

"(c) The historic existence of the lines. If a line is historically a 'tie-line' not built to serve customers, or if it was built solely for territorial purposes and is not serving customers, this is insufficient to justify an assignment wholly on the basis of pre-existing lines. On the other hand, if a supplier has active, adequate distribution lines in an area and historically has sought to and has served the particular needs of the area, we believe this should be given weight toward assigning that area and that load to the historic supplier.

"(3) ELECTRICAL CAPABILITY. This includes the location of lines, their type, and their electrical capabilities as already discussed. In addition, however, it includes facilities the respective suppliers have in the general area which would benefit the area and permit economical service. For example, the presence or absence of nearby substations, offices where complaints may be taken, maintenance and repair crews for both ordinary and emergency service, etc., must be considered. Where one supplier has a large convenient operation offering multiple services and the other supplier is limited, we have given weight to the supplier who can render service more readily and economically than the other. Travel time of repairmen, installers, etc., is not only an expense item to be considered, but a significant factor in service reliability. In making these assignments, we have given consideration to comparisons of travel time and distances from the respective supplier's offices to points in the areas.

"(4) THE NEEDS AND PREFERENCES OF THE PUBLIC IN THE AREA IN QUESTION. Pertinent to this consideration is the growth potential and type of future service needs of the area in question. While such considerations are admittedly speculative to some extent, we are convinced it must not be excluded from consideration. In this regard, as already alluded, we have weighed as best we can whether each area in-

volved in the main has residential, commercial, or industrial potential. For example, while the statute accords each supplier a 600-foot corridor along all existing lines—whether transmission or distribution—we hold it to be more in accordance with public convenience and necessity if, rather than arbitrarily establishing a one-mile corridor along all transmission lines, we establish a wider corridor in certain areas with industrial potential or in areas where it is reasonable to expect the owner of the transmission line to serve residential and commercial loads while in other areas conferring no rights upon the same owner of the transmission line except those already provided by law.

"From the testimony and from experience in other matters involving electric cooperatives and power companies, it appears to us almost universally true that cooperative members prefer a continuation and expansion of cooperative service and territory.

"On the other hand, industry, particularly heavy industry, just as strongly prefers the service of the power company. Each preference is grounded on understandable and realistic considerations and philosophies. The areas of high industrial potential, highly promoted and having pre-existing residential distribution lines of the cooperative with no, or very few, VEPCO distribution lines give us greatest pause. We realize that the cooperative has made great contributions to the social and economic betterment of the State and its people by serving areas considered unprofitable by the power companies and, therefore, unserved by them.

"At the same time, the cooperative is a non-profit organization and the power company can only exist on profits. Traditionally, the cooperative has not attracted industry to its service area while the power company has. The attraction of the capital wealth of industry also builds up residential loads. We are convinced that many areas of the State will be handicapped in, if not precluded from, obtaining industry, unless weight is given to industry's obvious preferences for the power company.

"Further, we hold that the power company is better equipped and better able to serve heavy industrial loads. We are of the considered opinion that it would be harmful both to the cooperative and to the public in an area with industrial potential to assign that area to the cooperative for all purposes. On the other hand, where in many cases the cooperative has histori-

cally served the residential, agricultural, and small commercial loads, we think it would be manifestly unjust and duplicative to take this area and their potential residential, agricultural, and commercial loads from the cooperative.

"Our solution in these areas of high industrial potential where there are cooperative lines is, therefore, to assign the area to cooperative for certain load purposes, and effectively, assign the heavy industrial load in the area to both the cooperative and the power company. We say 'assign to both' because either is left free to serve the heavier load upon reasonable choice of the consumer. If either is chosen to provide a service which it cannot reasonably provide, or which the other supplier more reasonably should provide, we shall consider the individual circumstances when they arise. We are aware that this may not at first appear the ideal solution for either supplier, but we believe it will prove best in the long run for the areas and the contending supplies as well and is consistent with the spirit of the statutes under which our duties arise. .

"(5) THE LOCATION OF MUNICIPAL ELECTRIC SYSTEMS. Notwithstanding that municipally owned and operated systems are not defined as electric suppliers under the Act, and, therefore, are not protected from the competition of these suppliers (nor does our assignment protect these electric suppliers from the competition of municipal systems), we would prefer to make assignments in cognizance of the areas where municipal systems are directly involved. We consider this to be in the interests of economics and harmony in the electric industry of the State.

"In this instance there appears to be a high incidence of municipal lines in some of all the areas involved, whether red, green, blue, or yellow. The record does not, as already said, permit us to determine that these areas be left unassigned under the statute. To do so could do injustice to the suppliers seeking to serve the areas and to the people in those areas. There arises from the record no inference that the competitive relationship as among the cooperative, the power company, and the several municipal systems has been or will become destructive. Further, in making the assignments under this Order, we do not encourage—in fact, we shall attempt reasonably to prevent—any exodus en masse from muncipal systems to the systems of either the power company or the cooperative. Before ordering an assigned supplier to serve a customer proxi-

mate to the lines of a municipal system, we shall — as we have done in the past—look carefully into the project's economic feasibility, its potentiality for waste and duplication, and the quality, type, and manner of service available from said proximate municipal facilities. (See Docket E-22, Sub 81, May 4, 1966).

"(6) TELEPHONE EXCHANGES. Whether the public in an area can contact the office of the supplier without paying a long distance charge for telephone service is a factor related to the public convenience and necessity and we have given weight to this in making the territorial assignments herein.

"The foregoing are the major considerations taken into account.

Our judgment resulting in the assignments hereinafter has given no particular priority or importance to any single factor. Rather, we have sought to balance all factors and, where contradictions appeared, have sought to resolve them in terms of the overall public interest as set forth in the three general guidelines at the beginning."

[3]　As can be seen from the findings of facts and from the above-quoted statements and conclusions, the Commission has given detailed consideration to most, if not all, of the factors bearing upon a determination of how to assign areas B-1 through B-6. It is no arbitrary action by the Commission to choose the alternative of assigning jointly to VEPCO and Woodstock. Insofar as assigning areas jointly for some purposes is concerned, the Utilities Commission has exercised its discretionary authority in good faith in the light of the existing facts and circumstances, and we are not at liberty to direct it to choose another alternative. 1 Strong, N.C. Index 2d, *supra*.

[4]　However, there are no findings of fact which justify the Commission's establishment of the 400 KW load as being the maximum of the individual assignment to Woodstock. Numerous factors are left to conjecture. What are the capabilities of Woodstock's existing lines? Are they capable of adequately serving customer demands in excess of 400 KW? Would it best serve the public convenience and necessity for Woodstock to rework its existing lines to serve in excess of 400 KW demands, or for VEPCO to construct a heretofore non-existent distribution system? What is the relation between 400 KW demand and heavy industrial loads? Do loads in excess of 400 KW generally require an alternate source of power? These are other questions are left unanswered by the findings of fact in this record. The Commission has found no basis for establishing 400 KW as the maximum of Wood-

stock's individual assignment, and to that extent its order is arbitrary and must be reversed.

[5]   Appellants' final contention is that the Commission's order violated the constitutional rights of both Woodstock and the consuming public. We dispose of this contention with the observation that neither Woodstock nor the consuming public has shown any constitutional right to have the areas assigned to any electric supplier. Certainly Woodstock cannot claim that it has a franchise which is being destroyed.

For the reasons stated above the order of the Utilities Commission is reversed and this cause is remanded for such further proceedings as may be appropriate.

Reversed and Remanded.

CAMPBELL and MORRIS, JJ., concur.